**UNITED STATES**

v.

**Sergeant Ronald W. COOPER, FR 450–02–9578, 32d Tactical Fighter Squadron, United States Air Forces in Europe.**

**ACM S24436.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 20 May 1976.

Decided 25 Jan. 1977.

Appellate Counsel for the Accused: Colonel Robert W. Norris and Captain Thomas S. Markiewicz.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr.

Before BUEHLER, HERMAN and OR-SER, Appellate Military Judges.

## DECISION

BUEHLER, Senior Judge:

Contrary to his pleas, the accused stands convicted by a special court-martial consisting of a military judge alone, of one specification alleging unlawful entry, three specifications of larceny, and one specification of wrongfully communicating a threat, in violation of Articles 134 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 934, 921. The reviewing authority disapproved two of the larceny specifications, and approved a reduced sentence extending to a bad conduct discharge, confinement at hard labor for four months and reduction to airman.

Appellate defense counsel have invited our attention to two assignments of error, only one of which merits our consideration. Counsel assert that the search of the accused's quarters and the seizure of Prosecution Exhibit 2 was unlawful inasmuch as the probable cause required for the issuance of the search authority was secured in violation of the accused's Article 31 rights.

The facts necessary for a resolution of this issue are as follows:

On 24 December 1974, Special Agent Wightman, Office of Special Investigations (OSI), was called to investigate an apparent break-in of the Camp New Amsterdam Audio Club storage room. He observed that a rear window had been broken and found a rock in the room opposite the window. An inventory reportedly made by one of the club employees indicated that a Technics RS 676 US cassette tape deck was missing.

During the last week of December 1974, Sergeant Burns, a close acquaintance of the accused, observed a Technics 676 cassette tape deck in the accused's barracks room. At that time, the accused led Sergeant Burns to believe that he had purchased the deck.

Thereafter, in February of 1975, while both the accused and Burns were on temporary duty at an air base in Spain, the accused related to Burns that he had acquired the tape deck by throwing something solid through the window of the Audio Club storage room to gain access.

In May 1975, the accused and Burns moved from the barracks into an off-base house which they shared. Subsequently, in September 1975, the accused moved to a different house taking with him the cassette tape deck.

On 25 March 1976, a Sergeant Sinclair related to Technical Sergeant Peter W. Coxon, a security police investigator, that the accused had stolen a tape deck from the Audio Club and in doing so had thrown a rock through the window. Sinclair further advised Coxon to talk to Sergeant Burns who knew more about the theft. Sergeant Coxon contacted Burns who related what he knew about the accused's involvement in the theft of the cassette tape deck.

With this information in hand, Sergeant Coxon spoke to the base staff judge advocate and inquired what he would need to get a search warrant. Coxon was advised that due to the passage of time since the cassette tape deck was last observed in the accused's possession, it would be necessary to determine anew whether the deck was still in the accused's possession.

Armed with this advice, Coxon once again contacted Burns. What transpired thereafter is contained in Burns' trial testimony as follows:

Q. Did Tech Sergeant Coxon ask you to do anything for him?

A. Yes, he did.

Q. What did he ask you?

A. He asked me if I would stop by Sergeant Cooper's house during my off-duty time, to see if these items . . . well, particularly one item, a tape deck, was in his house at the time.

Q. What did you do, then, that weekend?

A. I didn't go out to his house.

Q. You didn't go out?

A. No, I did not.

Q. Or you didn't get in?

A. No. I didn't go into his house. I was in Soest that weekend.

Q. Did you, subsequent to that time, have an opportunity to get the information that Sergeant Coxon required?

A. One afternoon Sergeant Cooper stopped by the office. I believe it was the latter part of the last week of March.

Q. Do you know the day?

A. I'm not exactly sure of the date.

Q. No, the day, Monday, Tuesday, Wednesday, Thursday, Friday?

A. I believe it was a Monday or a Tuesday.

Q. Can you, as detailed as you can remember, its been some time ago, give us that conversation that occurred between you and Sergeant Cooper?

A. Yes. Well, he stopped by, it was, I guess, shortly after he had gotten off work, it was around four o'clock in the afternoon, and stopped by and said, "Hello", and asked how the Radar Shop was doing for write-ups. We discussed about taking leave, taking vacation around Europe, several different places, and I asked him how his house was, and how they had their house set up, furnishings-wise, and asked about his stereo equipment. And he told me he had his stereo and his tape deck, and turntable and speakers, and also his roommate had a stereo system, and it was all set up in the house.

Q. He specifically mentioned his tape deck?

A. Yes.

On cross-examination, Burns was asked "did he volunteer the information about the stereo equipment, or did you ask him about it?" Burns replied, "I just asked him how he had his house set up, if he had his stereo equipment."

Coxon was advised of the accused's admission relative to the tape deck. He in turn briefed the base commander who authorized the search of the accused's off-base quarters.

One of the items seized in the course of the search was Prosecution Exhibit 2, a Technics 676 cassette tape deck. It was stipulated that Prosecution Exhibit 2 is the property of the Camp New Amsterdam Audio Club.

Testifying on the merits, the accused admitted that he engaged in a personal conversation on the 28th and 29th of March at Burns' duty section where impending holidays in April and leave were discussed as well as radar discrepancies. He maintained that the subject of his apartment furnishings or a cassette deck was never discussed.

At trial there was no objection to Burns' testimony relative to the accused's admission that he had "his tape deck." However, the defense did object to the admission of Prosecution Exhibit 2 on the ground of illegal search and seizure.

■ At the outset, we observe that the accused's admission to Burns, that he "still had the tape deck . . . set up in his house," was a crucial factor in establishing probable cause to search the accused's residence. Some seven months had elapsed between the time Burns last saw the tape deck in the accused's possession and the date the search authority was granted. Although "time alone provides no magic formula for determining the presence or absence of a sufficient basis to authorize a search, 'it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.' *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932)." *United States v. Britt*, 17 U.S.C.M.A. 617, 38 C.M.R. 415, 417 (1968), citing *United States v. Brown*, 10 U.S.C.M.A. 482, 28 C.M.R. 48 (1959). As we recently iterated in *United States v. Bright*, No. 22059, 2 M.J. 663 (A.F.C.M.R. 14 Sept. 1976):

Essential to a determination as to whether probable cause to search exists is the relationship between the time when the authority to search is given and the time when the facts and circumstances relied upon to justify the search occurred.

■ Consequently, without the accused's admission to Burns, the information furnished the commander would have been too stale to serve as a basis for reasonably believing that the accused still possessed the tape deck and, thus, for authorizing the search.

Military law provides that probable cause to search cannot be based on illegally obtained information or evidence. Manual for Courts-Martial, 1969 (Rev.), paragraph 152; *United States v. McCrary*, 18 U.S.C. M.A. 104, 39 C.M.R. 104 (1969). Accordingly, appellate defense counsel contend that the instant search was unlawful because Burns was acting in an official capacity when he obtained the tape deck information from the accused and thus was required to first warn the accused of his Article 31 rights. Counsel cite the following Manual provision in support of their contention:[1]

> A statement is obtained in violation of Article 31(b) if, without an adequate warning under that article, a person subject to the code or acting as an instrument of such a person . . . obtained it by official interrogation or request, formal or informal, from one who in connection with the interrogation or request was accused or suspected of the offense to which the statement relates.

Manual for Courts-Martial, *supra*, paragraph 140*a*(2). Counsel concede, however, that "incriminating statements by an accused to a so-called 'informer' in the course of their relationship are admissible in evidence, notwithstanding any failure of the informer to warn the accused in accordance with Article 31." See *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Hinkson*, 17 U.S.C.M.A. 126, 37 C.M.R. 390 (1967); *United States v. Gibson*, 3 U.S.C. M.A. 746, 14 C.M.R. 164 (1954); *United States v. Turck*, 49 C.M.R. 49 (A.F.C.M.R. 1974), pet. denied, 49 C.M.R. 889 (1974).

■ We believe that the relevant facts clearly demonstrate that Burns was acting as an informer for the OSI and that his conversation with the accused was designed to elicit the information necessary for establishing probable cause to search the accused's residence for the stolen tape deck. Nevertheless, we perceive no abridgement of the accused's constitutional or Article 31 rights resulting from this tactic. In *United States v. Hinkson, supra*, the Court was faced with a similar situation. There, Hinkson made incriminating statements to an individual who pretended he was engaged in illegal transactions but who was actually acting as an undercover informant for the Office of Naval Intelligence (ONI). In finding these statements admissible, the Court likened the situation to that present in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), where the use of a radio transmitter concealed under the front seat of the informant's car was condemned but only because Massiah had already been indicted. In contrast, the Court pointed out that Hinkson had not been charged and was not confronted with a custodial situation. After noting that the informant "was not in truth the kind of person the accused believed him to be was the risk he took when he engaged in the conversation," the Court reasoned:

> Long ago we held that the Article 31 requirement that an accused or suspect not be interrogated or requested to make a statement without first being advised of his right to remain silent, does not apply to an undercover agent who merely engages in ordinary conversation with an unwary suspect. *United States v. Gibson*, 3 U.S.C.M.A. 746, 14 C.M.R. 164. Similarly, the Supreme Court of the United States has determined that conversations between a suspect and a person

---

1. Counsel have also cited the following cases to bolster their assertion that Burns acted officially: *United States v. Dohle*, 24 U.S.C.M.A. 34, 51 C.M.R. 84, 1 M.J. 223 (1975); *United States v. Wood*, 22 U.S.C.M.A. 369, 47 C.M.R. 124 (1973); *United States v. McCrary, supra*; and *United States v. Beck*, 15 U.S.C.M.A. 333, 35 C.M.R. 305 (1965). We note, however, that in each of these cases, none of the questioners were simply undercover informants. The "officiality" of their conduct was manifested by a more significant responsibility in the performance of their assigned duties.

secretly cooperating with the police do not violate the Fifth Amendment's prohibition against compulsory self-incrimination. [Citing *Hoffa v. United States, supra.*]

Correspondingly, in *United States v. Turck, supra,* we found a search lawful where probable cause therefor was obtained from an informer who had entered Turck's apartment for the avowed purpose of detecting stolen property therein and who had deliberately concealed his purpose from Turck. In support of this finding, we quoted the following language from *Hoffa v. United States, supra,* 385 U.S. at page 302, 87 S.Ct. at page 413;

> In the present case, however, it is evident that no interest legitimately protected by the Fourth Amendment is involved. It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. Partin did not enter the suite by force or stealth. He was not a surreptitious eavesdropper. Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of his hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing.

In the instant case, Burns was asked by the OSI to visit the accused's home to determine whether the accused still possessed the tape deck. Burns did not do this. Instead, during a conversation initiated by the accused, Burns mentioned the subject of the accused's house furnishings and stereo equipment. The accused readily revealed that he still had the tape deck. Indeed, he had no reason to conceal this information since he had previously related to Burns that he had stolen the property. In sum, the accused obviously relied as much on his misplaced confidence in Burns' silence as did Massiah, Hoffa, and Turck on the informants involved in their cases. We are satisfied, therefore, that the accused's Article 31 and Fourth Amendment rights were not violated by Burns' conduct. Accordingly, we find that Prosecution Exhibit 2 was properly admitted in evidence over defense objection.

The findings of guilty and the sentence are

AFFIRMED.

HERMAN and ORSER, Judges, concur.